CHURCHILL COFFING and JOHN H. COFFING, Appellants, *v.*
EDMUND D. TAYLOR, Appellee.

APPEAL FROM LA SALLE.

A sale by a partner to his copartner, of all his interest in the property, effects, claims, assets and debts of a firm, does not pass to the purchaser an account standing upon the books of the firm against the partner making the sale, nor the seller's interest in the capital by him originally contributed to the firm.

Where a contract is reduced to writing, and deliberately read over by the parties before executing it, and there is no evidence of any fraud, a bill cannot be sustained by one of the parties to reform the contract upon the ground that he understood its effect to be different from its legal one.

To reform a contract, it must be shown that the true intention of the parties was different from the contract as reduced to writing, and that, by some fraud or mistake, the real contract between the parties was not truly reduced to writing. Proof of the parties' interpretation of the contract is not sufficient to show fraud or mistake in drawing it up.

A contract deliberately made, read over and executed by parties, will not be reformed upon the ground that the witnesses present understood its effect to be different from its legal one.

Where a mortgage provided that if the mortgagor would at any time raise, by mortgaging or selling the mortgaged premises, sufficient money to pay the indebtedness, the mortgagee should redeed to the mortgagor the premises, for the purpose of enabling him to pay the same, and that the mortgage should not prevent the mortgagor from selling or mortgaging the premises, for the purpose of paying the indebtedness: *Held*, that such proviso did not clothe the mortgagor with a power to sell the premises discharged of the mortgage, but only provided for a reconveyance to the mortgagor, in case he could raise the money by selling or mortgaging.

That notwithstanding such proviso, the mortgagor had all the power over the equity of redemption that he would have had if such proviso had not been contained in the mortgage.

Where a party has an interest in his own right, and a power, a conveyance generally without naming the power, will operate as a conveyance of the interest, and not as an exercise of the power.

Where a party has an interest and a power, it is a question of fact whether, in making the conveyance, he exercised the power; and where it expressly appears, upon the face of the conveyance, that the party did not intend to execute the power, it cannot be held to have been exercised.

Where a party has an interest and a power, and makes a conveyance, it will be held to operate upon his interest only, unless the conveyance discloses the power, and shows upon its face that it was executed under it.

Where the mortgagor conveyed the mortgaged premises, and covenanted that the mortgage was paid: *Held*, that such conveyance was not a breach of trust, so as to give the mortgagee the right of foreclosure before the debt became due by the terms of the mortgage, nor a forfeiture of the credit given thereby.

THIS was a bill in chancery, filed March 8, 1853, in the La Salle Circuit Court, by the appellee, against the appellants and Asenath Coffing, the wife of Churchill Coffing, and alleges in substance: that, in the year 1847, the appellee, I. D. Harmon, and Churchill Coffing, formed a copartnership for carrying on mercantile and other business, at Peru, Ill., under the name of I. D. Harmon & Co., which continued until dissolved as after

mentioned. That during the continuance of the partnership, C. Coffing was the owner of the east five feet of lot 10, block 153, so much of lot 11 in the same block as was afterwards covered and occupied by stone stores, rented by William Paul and the firm of Taylor & Coffing, and lot 3 and a portion of the west half of lot 2, in subdivision of the Trustees of the Illinois and Michigan Canal, of the N. W. frac. Sec. 21, T. 31 N., R. 1 E., which were principally unimproved; and that C. Coffing withdrew from the firm money and goods to the amount of more than $20,000, for his individual use, of which sum he applied $15,000 and upwards in the erection of buildings upon said premises. That at the time of the withdrawal of said assets, and during the existence of the copartnership of I. D. Harmon & Co., and of Taylor & Coffing after mentioned, the appellee resided in Indiana, and had but little knowledge of the business; and that C. Coffing resided at Peru, and was better acquainted therewith. That about Sept. 30, 1850, the firm of I. D. Harmon & Co. was dissolved by consent, and the appellee and C. Coffing assumed the liabilities and became the owners of the assets of that firm, among which assets was the debt of C. Coffing to the firm. That thereupon the appellee and C. Coffing formed a new copartnership, under the name of Taylor & Coffing, and carried on the business under that name, and that C. Coffing's debt became due from him to the new firm. That on the 17th May, 1851, while the firm of Taylor & Coffing still existed, an account was stated between that firm and C. Coffing, and the amount of his debt to the firm found to be $18,340. That C. Coffing at that time being the owner of the above premises, requested the appellee, as the other partner of the new firm, to extend the further payment of said debt upon the security of a mortgage of said premises, which the appellee agreed to, and the time of payment was extended to three years from May 17, 1851. Thereupon, C. Coffing and his wife, for the purpose of securing said debt, executed their deed, dated May 17, 1851, to the firm of Taylor & Coffing, conveying to said firm the above premises, which deed was absolute on its face; and that on the same May 17, 1851, the appellee and C. Coffing executed an indenture of that date, in the nature of a defeasance to said deed, which, after reciting that C. Coffing, of the firm of Taylor & Coffing, was indebted to said firm in the sum of $18,340, and to secure the said firm, the said Coffing had that day made and executed a deed of conveyance to the said firm of the above premises, provided that "If the said Churchill Coffing shall well and truly pay, or cause to be paid, the said sum of $18,340 to the said Taylor & Coffing, or their representatives or assigns, within three years from the date of said deed of conveyance and of these pres-

C. Coffing and J. H. Coffing *v.* Taylor.

ents, or if the said Coffing shall pay any part of said indebtedness within the said term, then all of the above described property, if all of the said indebtedness shall be paid, shall be reconveyed to the said Churchill Coffing, or so much of it shall be released and reconveyed proportioned to the amount of payment made by him of the indebtedness aforesaid; and further, if the said Coffing can at any time within the three years aforesaid, raise by mortgaging the said premises, or by selling the same, or otherwise, sufficient money to pay said indebtedness, then the said Taylor & Coffing shall redeed to the said Churchill Coffing the premises above described, for the purpose of enabling the said Coffing to pay the said indebtedness; and the said deed of conveyance to Taylor & Coffing shall not prevent the said Coffing from selling or mortgaging the said premises, or any portion of them, for the purpose of paying said indebtedness."

That on the 17th May, 1851, the firm of Taylor & Coffing were indebted more than $40,000, and were paying interest thereon at the rate of ten per cent., it being for borrowed money, and were obliged to carry along said $18,340 at ten per cent. interest, in consequence of C. Coffing's failure to pay his debt to the firm.

That at the time of the execution of said deeds, C. Coffing notified I. L. Coates & Co., William Paul and I. D. Harmon & Co., who occupied said premises as tenants, that from that time they should pay rents therefor to Taylor & Coffing, and for a long time afterwards they did so. That at the time of the execution of said deeds, it was agreed and understood between C. Coffing and the firm of Taylor & Coffing, that the firm should collect and retain the rents of said premises, in lieu of interest on said debt.

The bill further alleges, that on the 27th April, 1852, C. Coffing applied to the appellee, and proposed to sell to him his (Coffing's) interest in the Salisbury plank road company, and the Illinois river bank, all Coffing's interest in the property, effects, claims, assets and debts of the firm of Taylor & Coffing, and that the appellee should assume all the liabilities of the firm and release Coffing therefrom, pay Coffing $500 per annum, quarterly, for his services as president of said bank and plank road company, and $5,000, by acquitting Coffing of that amount of his debt to the firm of Taylor & Coffing. That the appellee having agreed to said terms, articles of agreement were drawn up by Coffing, and signed by the appellee and Coffing respectively, which were as follows:

"WHEREAS, Col. E. D. Taylor, of Michigan city, in the State of Indiana, one of the partners of the firm of Taylor & Coffing, of Peru, La Salle county and State of Illinois, has agreed to indorse upon an indenture given by Churchill Coffing, of

C. Coffing and J. H. Coffing *v.* Taylor.

Peru, aforesaid, to Taylor & Coffing, for eighteen thousand three hundred and forty dollars, the sum of five thousand dollars, as so much paid upon said indenture by the said Coffing; and whereas, the said E. D. Taylor has also agreed to assume and pay all debts, liabilities, notes or drafts outstanding against the firm of Taylor & Coffing, and release the said Coffing entirely therefrom; and whereas, the said E. D. Taylor, one of the proprietors of the Illinois river bank, of Taylor & Coffing, has agreed to pay to the said C. Coffing for the said bank and for the Salisbury plank road company, the sum of five hundred dollars per annum, to be paid to the said C. Coffing quarterly for the space of ———— years, for his services as president of said bank and of the Salisbury plank road company:

Now THEREFORE, KNOW ALL MEN BY THESE PRESENTS, That I, Churchill Coffing, of Peru, La Salle county and State of Illinois, for and in consideration of the sum of five thousand dollars, indorsed upon said indenture as above recited, and also in consideration of the said Taylor assuming and paying the debts and liabilities of the said Taylor & Coffing, and releasing the said Coffing from all liability or responsibility therefor; and also in consideration of the payment of five hundred dollars to the said Coffing, for his services as president of the Salisbury plank road company and the Illinois river bank of Taylor & Coffing, as aforesaid, has (*have*) sold, transferred, assigned and set over, and by these presents do sell, transfer, assign and set over to the said E. D. Taylor, his heirs and assigns, all my right, title and interest in and to all property, debts, accounts, notes, books and papers, belonging to the firm of Taylor & Coffing, (*excepting the indenture given by the said Coffing to Taylor & Coffing aforesaid, which is to stand and remain as it is, unaffected by this deed of sale,*) and also, all my right, title and interest of every kind and nature in or to the charter of the Illinois river bank of Taylor & Coffing, and in or to the charter of the Salisbury plank road company, and all my interest in the stock, notes, bills, papers, books, money and all other property belonging or appertaining to said bank, or to said C. Coffing & Co., or to the said Salisbury plank road company. And I, the said Coffing, do hereby promise and agree to use all honorable means to advance the interests of said institutions, and faithfully and truly perform such duties as shall devolve upon me by virtue of the office of president, etc., so long as I shall be required to act in that capacity for the ———— term aforesaid.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 27th day of April, 1852.　　　　　　　　　　CHURCHILL COFFING. [ L. S. ]

KNOW ALL MEN BY THESE PRESENTS, That I, E. D. Taylor, of Michigan City, Indiana, in consideration of the sale this day made by the said Churchill Coffing, contained in the foregoing indenture, do hereby covenant and agree with the said Coffing, his heirs and assigns, to have indorsed upon C. Coffing's indenture for eighteen thousand three hundred and forty dollars, now in the possession of Taylor & Coffing, the sum of five thousand dollars, as so much paid upon said indenture by the said Coffing, and also that I will assume and pay all debts, liabilities, notes or drafts outstanding against the said firm of Taylor & Coffing, and release the said Coffing entirely therefrom; and further, as one of the proprietors of the Illinois river bank of Taylor & Coffing, and of the Salisbury plank road company, the sum of five hundred dollars per annum shall be paid to the said Coffing, quarterly, for the space of ———— years, for his services as president of said bank and plank road company.

IN WITNESS WHEREOF, I have this 27th day of April, 1852, hereunto set my hand and seal.　　　　　　　　　　E. D. TAYLOR. [ L. S. ]

C. Coffing and J. H. Coffing *v.* Taylor.

The bill then charges, that the real intention and understanding of both the appellee and Coffing, before the same was pretended to be reduced to writing by Coffing, was the same as above stated, with the additional proviso, that nothing in said articles contained should alter or affect the indentures securing Coffing's debt to the firm, so as to prevent Coffing having three years' time in which to redeem said premises, and such was the construction placed on said articles by both parties at the time of their execution. That Coffing did not claim or collect the first quarter's rents, falling due after the assignment of his interest, but the same were collected by the appellee's agent without objection by Coffing.

That some time afterwards, Coffing notified the tenants not to pay rents to the appellee's agent, and that they were payable to him, and, to the appellee's surprise, Coffing then first pretended that he had not assigned to the appellee his interest in Coffing's debt to the firm of Taylor and Coffing, and asserted that he had gotten a technical advantage of the appellee which he intended to keep, and that Coffing pretended that his debt was reserved from said sale by the clause in said articles of agreement, in these words, " excepting the indenture given by the said Coffing to Taylor & Coffing aforesaid, which is to stand and remain as it is, unaffected by this deed of sale." The bill then charges that Coffing was an attorney and lawyer, and skilled in the drafting and construction of legal instruments, and in the interpretation of phrases in law, and that the appellee was unlearned in the law and unskilled in drafting legal instruments, and in the use and interpretation of phrases in law; that he had great confidence in Coffing's integrity and consulted no attorney, but having agreed upon the terms of sale, entrusted Coffing as attorney for both parties to draw up the writings. That Coffing prepared the articles in his own hand-writing, and that when presented to the appellee for execution, they were read by Coffing to the appellee, the appellee not reading or particularly examining them, and having confidence in Coffing's honor and integrity, and perceiving in the articles general words conveying to the appellee, as he thought, all of Coffing's interest in the assets of Taylor & Coffing, he signed on his part, and accepted those executed by Coffing, without submitting the same to any other attorney. That the appellee called Coffing's attention to the clause of exception before signing, and inquired if it was not designed to preserve to Coffing the right to redeem the premises within three years, and Coffing replied it was, and that Coffing did not explain to the appellee that it would be construed differently, or had any other meaning, and especially,

did not explain that it reserved the debt of Coffing from the transfer.

That appellee paid the full value of all the assets of the firm of Taylor and Coffing at the time of the sale, including the debt of Coffing, and that all of said assets did not much, if any, exceed the liabilities of Taylor & Coffing, and that the appellee had repeatedly offered Coffing to pay him $6,000 in cash, besides the assets, if Coffing would assume the liabilities of the firm and release the appellee, which Coffing refused.

The bill then charges, that said clause was fraudulently drawn up by Coffing to cheat and defraud the appellee, and as a part of the fraudulent conduct of Coffing, he studiously avoided using the word debt, or any other word to excite the suspicion of the appellee, and placed the clause in parenthesis as containing matters of small importance, and so framed the clause as to make it capable of a two-fold construction, that the appellee might then put one construction upon it, and Coffing afterwards develop another construction.

The bill further alleges, that the appellee afterwards credited $5,000 on the indenture, as part payment of the $18,340, leaving $13,340 still due thereon for principal. That C. Coffing, December 20, 1852, by deed of that date, for the consideration of $25,000, recited therein, conveyed the premises, with other property, to John H. Coffing, and that, in that deed, C. Coffing makes the following statement: " being the same property mortgaged by Churchill Coffing to Taylor & Coffing, on the 17th day of May, 1851, for the sum of $18,340, which said mortgage was expressly reserved and excepted from sale at the time Churchill Coffing, one of the partners of the firm of Taylor & Coffing, sold and conveyed to E. D. Taylor all of the said Coffing's interest in the property, debts, accounts, notes, books and papers belonging to the firm of Taylor & Coffing, as will more fully appear by said Coffing's deed to E. D. Taylor, made April 27th, 1852, and recorded in the records of La Salle county. And the said Churchill Coffing hereby covenants, that the said mortgage has been fully paid, and that E. D. Taylor has no interest whatever therein," which the appellee charges to be untrue.

That John H. Coffing had commenced, in the La Salle Circuit Court, an action of covenant against I. D. Harmon, with the view to enforce collections of the rents, and payment thereof to John H. Coffing; and that by virtue of the said indenture between C. Coffing and the appellee, and the sale by C. Coffing to John H. Coffing, and the payment of said $25.000, the appellee had become entitled to receive payment from C. Coffing of the balance of said debt, $13,340, with interest; and that C. Coffing held

that sum as trustee for the appellee; and that J. H. Coffing was bound to the extent of his interest in the premises for the payment to the appellee of $13,340, and that the title to the mortgaged premises had become absolute at law in the appellee, with a present right to foreclose the defendant's equity of redemption in the same.

The oath of the defendants to their answer was waived, and the bill prayed that the articles of agreement, dated April 27th, 1852, be so reformed and modified as to show that the debt of C. Coffing was thereby transferred to the appellee, and that so much of the clause of exception, so fraudulently inserted, as renders the same susceptible of the construction that the debt was reserved, be rescinded; for an account to be taken of the amount due on the debt; for a foreclosure and sale of the premises, and for an injunction restraining J. H. Coffing from prosecuting the suit against Harmon for rent, and the defendants from hindering the appellee in collecting the rents, and for general relief.

Churchill Coffing filed his answer, alleging in substance that in 1847, he, the appellee, and Harmon, formed a copartnership for the purposes stated in the bill, the terms of which were reduced to writing, and provided, that the partnership should commence January 1, 1848, and continue two years, and longer, at the option of the parties. That the appellee should furnish $5,000, and Coffing $10,000, making the amount of the actual capital; that Harmon was to devote his whole time to the business; that the profits and losses were to be shared equally; and that it should be the duty of Harmon, if required, at the end of each year to furnish to the other partners a written statement of the actual condition of the copartnership, the transactions in which it had been engaged, with a full account of its receipts and expenditures. The answer also alleges that at the time the partnership was formed, there was a verbal understanding that the appellee should furnish the firm a credit for borrowing money to the amount of $20,000, which was to compensate for his deficiency of capital contributed. That Coffing paid into the firm the $10,000, his part of the capital in money, and Taylor put in, as his part of the capital, the remnant of an old stock of goods, inventoried at $7,000, and drew from the firm in money, the difference between the inventory and the sum agreed to be contributed by him.

It sets out the various business relations between the appellee and Harmon prior to that time, and alleges that Coffing considered Harmon the representative of the appellee in the firm. That in the spring of 1849, Coffing was the owner of the premises mentioned in the bill, and becoming dissatisfied with

management of business, he proposed to Harmon to sell to the other partners his interest in the firm, and withdraw therefrom. Thereupon it was agreed between Coffing and Harmon, for himself and the appellee, that Harmon, as the representative of the firm, should erect, on the above premises, a warehouse for Coffing, with basement of stone and upper part of wood, on a plan agreed upon, at a cost of $7,500, at which price a contract had been made with a builder for its erection. That Harmon was to oversee the building and pay therefor $6,000 from the firm, and Coffing was to furnish the balance, $1,500; and for building the warehouse on these terms, Coffing was to release to the other partners, his interest in the firm, they assuming the liabilities. That Coffing entered into this agreement in good faith, supposing that the appellee approved of the same, but whether he assented to it at the time or not, Coffing was unable to say, but he knows that after the building was considerably advanced, the appellee assented to making further advances on account of the same. That upon the making of said agreement, Coffing supposed his interest and connection with the firm substantially ended, and would be entirely so when the warehouse was completed. That Coffing then went East, where he remained a year; and while absent, Harmon built the warehouse, changing the plan of the same, and for expenditures on the building, interest, exchange, etc., Coffing was charged in account, so that a balance of between $18,000 and $19,000, stood charged against him. That the appellee was fully aware of the expenditure at the time the same was made, which Coffing being absent knew nothing about, except the change in the plan, until the warehouse was nearly completed. That the appellee, from correspondence with those who had charge of the business of the firm, was familiar with the same, while Coffing knew but little of its operations or condition. That in February, 1850, Harmon proposed to Coffing that he should retire from the firm as agreed in the spring of 1849, subject to the approval of the appellee, and that an amicable adjustment be made of the extra cost of the warehouse, but when the appellee was consulted, he refused to consent to the same, and denied that he had sanctioned the agreement made by Harmon to that effect.

That business was continued as it had been previously until September, 1850, when the appellee sent Seth Paine to Peru to act for him in the management of the business. Soon after, the appellee came to Peru, required Harmon to withdraw from the firm, changed its name to that of " Taylor & Coffing," and placed Paine in charge of the business.

That on the seventh of March, 1851, Coffing and the appellee executed the following agreement:

C. Coffing and J. H. Coffing *v.* Taylor.

"THE firm of Isaac D. Harmon & Co. was, by consent, dissolved on the 30th September, 1850. The undersigned parties in said firm, continue the business under the name of Taylor & Coffing. The capital stock which Taylor & Coffing contributed, shall be transferred to the new books and represent the interest each has in the firm of Taylor & Coffing, viz.: E. D. Taylor, $,5000; Churchill Coffing, $10,000. The business to be continued for the purpose of paying off the debts of I. D. Harmon & Co., and reimbursing the capital aforesaid, as long as they shall mutually think best, and the profits and losses of the business shared mutually by the undersigned."

The answer denies that an account was stated between the parties on the 17th of May, 1851, but admits the execution of the mortgage mentioned in the bill for that sum, and alleges that the same was done without adjusting the account, or agreeing upon any balance due thereon, setting forth his (Coffing's) reasons for so doing.

It admits that the firm of Taylor & Coffing was then largely indebted, and that Coffing notified the tenants of the mortgaged premises to pay the rents to the firm, but denies that there was any agreement that the firm should retain the rents in lieu of interest on his account.

That on the 27th May, 1852, the appellee proposed to Coffing to purchase his interest in the Salisbury Plank Road Co., and the Illinois River Bank, Coffing's banking house and the ground on which it stood, and to assume and pay all the debts of the firm, to indorse upon Coffing's mortgage to the firm $5,000, to pay Coffing a salary of $500 per year as president of the bank, and to take the assets of the firm. That upon the proposition being made, Coffing remarked to appellee that his mortgage was to be excepted, to which the appellee replied, "certainly," and that then Coffing accepted of the proposition.

That the appellee then professing to be in great haste to leave town on that day, requested Coffing to draw up the writings as speedily as possible; and that Coffing, in the presence of the appellee, proceeded to write the same, the appellee looking over and reading the paragraphs as they were written, and after written, were read over and approved by the appellee. That Coffing then made a copy of the writing, signed by himself, which was read over and compared in the presence and hearing of the appellee. Denies that any inquiry was made during the preparation or execution of the papers as to their meaning or any part thereof, and says that the appellee appeared to understand and be satisfied with them. Denies that the intention and understanding of the parties was as stated in the bill, and that the parties then put the construction upon the agreement claimed by the appellant, but on the contrary, claims that both parties understood by the agreement, that the business

of the firm was closed, leaving the account against Coffing, out of which was to be reimbursed to the parties their original capital. That the $5,000 to be indorsed thereon and charged to the appellee, was a reimbursement to him of his capital. That Coffing was entitled to deduct from the balance then due, his capital $10,000, and the balance to be divided between the parties as profits of the partnership. Admits that the firm of Taylor & Coffing entered upon the mortgage a receipt of Coffing of $5,000, and that the tenants of the mortgaged premises continued to pay rent to appellee's agent. The answer denies that the appellee paid the full value of the assets, including the debt of Coffing, and states that Harmon, before he retired from the firm, made a statement of its affairs, showing that its effects were sufficient to pay its liabilities and restore the original capital, and that when Harmon retired from the firm, he was not charged anything for supposed losses to be shared by him. It admits that the appellee had made the offer to Coffing to pay him $6,000, if he would assume the liabilities of the firm and take the assets, but alleges that the appellee knew he was not in a condition to accept of the offer. It admits the execution of the deed to John H. Coffing, and the commencement of the suit by him against Harmon, and substantially denies all the other allegations of the bill.

John H. Coffing filed his answer, denying all knowledge of the dealings between the appellee and C. Coffing, except what appeared from the written articles of agreement between them, and setting forth the circumstances under which he took the conveyance mentioned in the bill, but as no question arose upon this part of the case, it is not deemed important to set them forth.

Replications were filed and proofs were taken, which were exceedingly voluminous. So much only of the proofs as are alluded to in the opinion of the court, is stated. The statement relative to the affairs of the firm, mentioned by C. Coffing in his answer, was filed, giving a detailed account of the assets of the firm and of its liabilities, July, 1850, and showing that the assets, including Coffing's account, amounted to $79,104.61, and its liabilities amounted to $53,690.07. Among other witnesses examined, were Seth Paine and Theron D. Brewster. Paine testified that he was present when the agreement of April 27, 1852, was made and signed by the parties. That he then understood the agreement as conveying to the appellee, Coffing's account; that the reservation referred solely to the time in which Coffing should have to redeem his property, and that when he testified, he understood the reservation to mean that, and nothing more. He also testified that at the time the mort-

gage was executed, there was an agreement that the rents should all be collected and offset against the interest. When asked as to the language of the parties, he replied that he could not give it, but it was a part of his being that there was a contract to that effect. Testimony tending to prove that Paine had made statements relative to the contract, different to what he testified to, and to impeach as well as to sustain his general character for truth and veracity, was introduced. Brewster testified to a conversation had between him and C. Coffing, relative to the agreement of April 27, 1852, and stated his understanding of what the agreement was, from what Coffing told him. Other testimony was introduced for the purpose of showing that Coffing understood the agreement at the time, as set forth in his answer.

The cause was heard before Hon. E. S. LELAND, Judge of the 9th Judicial Circuit, March 4, 1854, and a decree entered in favor of the appellee for $9,259.14, as the balance due upon C. Coffing's account, with interest from May 17, 1851, after deducting the rents received by the firm of Taylor and Coffing, and the appellee from the mortgaged premises, and ordering that sum to be paid in sixty days, and in default of payment, ordered that the defendants be foreclosed, and a sale made of the mortgaged premises ; from which decree Churchill Coffing and John H. Coffing appealed, and bring the case to this court.

C. BECKWITH and T. L. DICKEY, for Appellants.

S. S. HAYES and R. S. BLACKWELL, for Appellees.

SCATES, C. J. The bill professes to make a case for reforming an agreement, and for a foreclosure of a mortgage. I am of opinion that neither the bill nor proofs present sufficient grounds to entitle the party to relief, as prayed.

In making out the former case, I understood the defendant to assume the position that he bought of C. Coffing all his interest in the partnership enterprise between them, and that Coffing fraudulently drew up the contract to transfer this interest, in such manner and language as was liable to a double construction, and which, therefore, was insufficient to express and secure the whole interest bargained for, and intended to be conveyed. It is put upon the ground of design, and not of a mistake. Now is this shown to be true by the bill and evidence ?

First, we inquire of the intent of the parties. To arrive at it, we put ourselves, as well as we may, into their condition, examine their situation and circumstances, the character, condition and circumstances of the property, or interests, about which

they contract; and so examine into their contract, its terms, language, and, when proper, the negotiations which led to it, and thus elicit and apprehend their true intent and meaning. 4 Scam. R. 254; 1 Greenl. Ev., Secs. 287 to 289, and notes; 4 Gil. R. 536; 12 Ill. 218.

In viewing the situation of these contracting parties, and the condition or character of the property, we find they were partners in trade, one having advanced five and the other ten thousand dollars, as capital, for which they stood credited upon the partnership books; that Coffing had drawn out $18,340 for his private use, and had executed to the firm a mortgage to secure its payment to the firm, and which was not yet due for near two years. That the firm was owing large sums of money, and had large sums due to it, and large amounts of personal and real property.

This is the situation of the parties, and this is the character and condition of the property and interests they contract about, together with a private interest of Coffing in a certain charter, banking-house and business in it, under the charter. Whatever is said and agreed, we must understand as applying and being intended as applicable to all these circumstances.

The bill does not set up a sale of all Coffing's interests in the enterprise of the partnerships, for that would have claimed his capital with it, but that it was a sale of all his interest in the " property, effects, claims, assets and debts of the firm," together with Coffing's interest in his own private property in a charter, house and ·banking business. Such being the extent of the property and interests purchased, the controversy arises upon a clause of reservation inserted in the contract, as follows: " excepting the indenture given by the said Coffing to Taylor & Coffing aforesaid, which is to stand and remain as it is, unaffected by this deed of sale," but which the bill alleges should have read, "that nothing in said articles contained should alter or affect the indentures for securing Coffing's debt to the firm, so as to prevent Coffing having three years' time in which to redeem said premises;" and which last construction, the bill alleges, was placed upon it at the time of its execution by both parties. Two as shrewd and intelligent men, as this record shows these parties to be, need hardly be told that such an exception or reservation as the last, would be wholly inoperative and useless, as the length of credit and right of redemption were not in the least affected by ·the agreement. The credit and right of redemption were not interests of the firm, but of Coffing, individually, and in nowise contemplated by, or included in, those described in the agreement. Neither was his right to reimbursement of his capital on settlement with his partner of this part of the joint

enterprise, nor any other several interest, save his plank road charter, house and banking adventure under it.

In proposing a reformation of a contract, by change of a phrase or clause, it would be more comprehensible if operative meaning were given by the substitute. The effect of the one proposed here would be accomplished by simply striking out the excepting clause, for, by it, the interests named would be and stand in the precise condition proposed by this emendation. This would seem to present the case in an entirely different point of view, and more in the light of a bill to interpret, or correct the fraudulent interpretation of the contract, to the one given by the parties at the time of its execution, than one to reform the terms of it. So far from there being fraud in the making and execution of the contract, it does appear that the same was read and compared by the parties, their attention specially drawn to this particular part of it, and that they mutually agreed to a false and unmeaning interpretation of it, if witnesses are under no mistake, for it evidently means no such thing as is alleged for it, whatever else it may. Was all this fraudulently done by Coffing to impose on Taylor? It is difficult to search the secret mind of Coffing any further than provable acts and language offer indices to it and its motives. In presenting these *indicia,* we have been furnished, not only with the whole previous negotiation about, and the verbal conclusion of, this particular contract, but with, apparently, the whole history of their first connection, and previous business together, and its conditions and results, with considerable portions of each one's private transactions and affairs. Surveying this large field of operations, and gathering from it every ray of light reflected from every prominent object or transaction in it, it seems to make one or two facts apparent and satisfactorily plain : that the firm, although largely in debt, and pressed and liable to become embarrassed by it, was yet by no means insolvent, though supposed to have been badly managed. Taylor had offered to sell to Coffing at a sacrifice, which he was not in a situation to avail himself of. He offers, in turn, afterwards, his interest in the effects of the firm, if discharged from its liabilities, and certain individual property, as a reimbursement of advances. This was accepted, and the witnesses to this negotiation understood it, not only as including his interest in what the firm owned, but all his interest in the adventure. They do not pretend to give the words, nor do they state the substance of what was said in the negotiations, but it is very manifest that they give their own inferences and understanding. This is dangerous testimony, and must be received with great care and caution, to prevent a substitution of the witnesses' understanding for the contract and meaning of the parties. And

this is true, however strong the impression may be on the mind of witnesses, although the belief of it has become a part of his being, as one witness says. The condition of the partnership at the time, is invoked to aid. The only exhibition of its affairs shows the firm solvent, and capital safe, and profits accrued. The motive to make a sacrifice is not apparent from the condition of the firm.

Under such facts and circumstances as I have briefly alluded to, Coffing drew up an assignment, read it to Taylor, and he signed it, embracing a great deal less in it than we would understand the witnesses as included in the verbal agreement; and in the presence, too, of one of those witnesses. Now, at the time of the execution, the witness does not make the purport and extent of Coffing's statement clear, and to embrace distinctly any more than is included in its terms. We derive no aid in the interpretation, from that source, to favor the reformation proposed. When we turn to Coffing's statement of it, afterwards made to Brewster, we find it in general terms, with Brewster's particular understanding thrown in, like Paine's was into the verbal agreement. All this is wholly unsatisfactory, and insufficient to overcome and change the deliberate acts of Taylor, in reading, or having the contract truly read, and thereupon signing it. Taylor must meet and account for these acts, by showing that he was fraudulently imposed on in doing so, or he must abide the writing as it is. Were the whole contract now resting in parol, and offered in proof by one witness swearing that, in concluding the contract, the parties used the identical language of this agreement, I should so find this to be the contract, notwithstanding what Paine has sworn was his understanding of their meaning and contract, and Brewster's understanding of Coffing's statement of it afterwards. The writing is more reliable than the memory of a witness, for the exact words and meaning.

Once allow these parol meanings and understandings of witnesses of written contracts, and all distinction is at once destroyed between written and verbal contracts; and not only that, but parol contracts, established by the exact words used, or the substance of what was said, must, in like manner, yield to the inferences of witnesses. It is not enough to prove that witnesses understood the parties differently; it must be shown that the true intention of both parties was different, and that, by some mistake, or fraud, it was not truly represented in the writing. It is far short of either, in this case, to offer us Coffing's interpretation as proof of this mistake or fraud. There is no proof of imbecility on Taylor's part, nor of any relation of trusting confidence in the acts, skill, intelligence or integrity of Coffing. Taylor is shown

C. Coffing and J. H. Coffing *v.* Taylor.

to be very capable of taking care of his own interests, and was, in this instance, relying upon himself, and not upon Coffing. It has not the first feature in it of an imposition of that character, and we are not able or authorized to draw such inferences from the fact of Coffing drawing it up. Taylor had the opportunity, and did fairly examine the writing, before he signed it. The writing must thenceforth speak his language and intention for him. I know of no rule of law, in settling the interpretation of a controverted intent, that will allow one differing from the writing to be substituted, unless upon the ground of accident, mistake or fraud. Parties are sometimes held to their mutual acts, in fulfilling contracts, where they have acted and acquiesced in an erroneous construction. Latent ambiguities are explained by parol, but this is unlike either, or any other known rule for altering, or aiding in construction. It may be asked, why did Taylor sign the contract with this clause in it, if it does not express truly the agreement and meaning of the parties? He is presumed to understand, and if he did not in fact know it, yet he cannot in law be indulged to deny; that the writing alone can speak; and that witnesses cannot be heard to contradict it: the individual interpretation of the parties to it is inadmissible, and does not become part of it any further than authorized by it.

I am wholly unable to give any other solution to this dispute, than that the respective parties may have used and understood the terms and language they respectively used in the negotiation and contract, in a different sense, and that without culpability or fraud in either; and this is the more manifest and conclusive to my mind, from apparent mutual mistakes of the law which governs the interests about which they were dealing.

Both seem to have regarded a transfer of Coffing's interest in the effects of the *firm* as including his liability to account for the moneys advanced to him by the firm, or, in other words, withdrawn by him from it. This was not true in law. It would be but an item in the account in adjusting the liability of one partner with the other, upon the terms of the partnership, after its dissolution, and settlement of its affairs with third persons. *Wilson, etc., v. Soper, etc.,* 13 B. Monroe R. 411; *Smirall v. O'Bannons,* 7 B. Monroe R. 608; *Richardson* v. *The Bank of England,* 18 Eng. Ch. R. 169, 170; *Crawshay* v. *Collins,* 2 Russ. R. 325; 15 Ves. R. 218, 220; *Foster* v. *McDonald,* 1 Jac. and Walk. R. 252; *Ex parte Yonge,* 3 Ves. and Beam. R. 31; Story on Part. 522, Secs. 348, 348a, and note.

To obviate this, and prevent the debt from Coffing to the firm passing under that description of interest, the clause in controversy appears to have been inserted, with a view to except it

from the debts or effects conveyed. The clause, strictly and technically in law, is insufficient, and inapt for that purpose.

This exception reserves simply the "indenture," the incident or security for the debt, and not the debt itself. An assignment of the debt might carry the mortgage security as an incident, but the contrary is not true. *Ellison* v. *Daniels*, 11 N. Hamp. R. 274; *Bell* v. *Morse*, 6 ibid. 205; *Jackson ex dem. Curtis* v. *Bronson*, 19 John. R. 325. This indenture may have been assigned to one without carrying the debt, and then the debt to another without carrying with it the mortgage security, and so the two would become separated. The mortgage estate would be liable to be defeated, without payment to the assignee of it, who would have no power of foreclosure of it, or for the debt, and so it becomes a nullity or mere right of possession until payment. So of the assignee of the debt, who might enforce payment out of other property, but not by foreclosure on the mortgage, for that security is destroyed and gone while it remains in separate hands. I advert to these principles to show the mistake in law, of what is still very apparently the intention and meaning of Coffing. The witnesses go a great way beyond, and would not only have it understood that Coffing agreed to sink and abandon his capital put in, and transfer this amount drawn out, but they would understand all parties, and the witnesses present at the reading and execution of the contract, as agreeing that this exception simply reserved and preserved Coffing's rights as mortgagor to pay and redeem the estate, rights not at all contemplated in the transfer, or affected by it. It is impossible for me to see how men could so far misapprehend the import of language, as to draw this latter conclusion. The others might very naturally occur to men unfamiliar with the law governing property under these peculiar circumstances. This advance was not a debt to or effect of the firm, and there was no power in law to enforce it as such, even for the benefit of joint creditors. The liability of each partner for the debts of the firm could be enforced, but not as debts due the firm, for it arises under the law of contracts and partnership. The right of contribution to equalize profit and loss, is not one of the partnership firm, but of the individual members of it, arising out of it.

Before we can reform this contract, therefore, even upon the ground of misapprehension or mistake in the mind of Taylor, as to the extent of the property and interest he was entitled to acquire by the agreement, we must carefully examine, to see if we would not make the reformed contract such an one as would equally surprise and deceive the true intention of Coffing, and entitle him immediately to file a bill to reform the reformation.

It would not be enough that one of the parties so understood and intended it; both must. Otherwise the bill should rather be for rescision than reformation.

From all the proofs, I have no reason for a moment to believe, that Coffing ever intended to make, or would have consented to make the contract set up in the bill, with the interpretation of it given by the witnesses. We cannot, therefore, lay his interests, intentions and consent aside, and make a contract for him with defendant, by, or in the name of reforming this agreement, to meet his own understanding of it, and that of his witnesses.

This simple solution of misapprehension of each other's meaning, at once explains the difficulty, and should mutually remove all grounds for suspicion of each other's motives and conduct, and all cause for hard feelings and strife. I cannot say that this would place the parties in a satisfactory position, in relation to the property. Nor is it now in the power of the law, to correct a mistake on one side, while the other was in no fault in entering fairly into such a contract as he intended and understood himself as making, using no improper arts to impose on the other party.

I have no evidence in the record, that Taylor would ever have consented to enter into the contract as now contended for by Coffing; nor would he, judging from the claims made for him in this case, have ever entered into the contract as stated in his own bill, with a full knowledge of all the legal consequences and effects flowing from it, as I understand the law applicable to it.

The only difference I can make between them is, that under Taylor's statement, the $13,340, balance of Coffing's withdrawals, passed; and by Coffing's statement, it did not. But we are clearly of opinion that the allegations of the bill and proofs will not authorize the emendation asked.

It would seem to me, that the construction put upon the defeasance, is equally unfortunate and unsustainable. It simply recites what is the right and power of a mortgagor, that of selling or remortgaging for the payment of the debt, and declares that, in the event he shall raise or be able to raise the money in that mode, the mortgagees shall reconvey to Coffing, the mortgagor, to enable him to do so. This is supposed to confer a power of sale, in the execution of which he becomes trustee of the mortgagees. He had all the power without it, that is claimed to be contained in it. All the effect that I could give it, would be to enforce it against the mortgagees as a covenant to reconvey, when a proper case was presented, to enable the mortgagor to convey to new parties. And the case would only be required to show, that another purchaser or mortgagee refused to take a conveyance,

without such release of the previous incumbrance. But not in any sense, as enabling him to convey subject to it, for that he may do by law, as owner of the equity of redemption. Consequently, I do not understand the parties, as intending to create a power already in existence, but to provide for making it effectual by releasing the encumbrance, whenever that might be required.

But supposing that the deed of defeasance did raise a power, and create a trust, still it did not destroy his equity of redemption, nor power of sale of it. And it becomes a question of fact, whether he exercised the power under the trust, or his right of sale of his own equity. The deed itself leaves no room for doubt that Coffing sold in his own right, because he expressly recites the existence of the mortgage, and covenants not to remove it, but that it is paid off and discharged, clearly showing that he conveys in his own right, and not by power conferred upon him as trustee. The deed should disclose the power and right as trustee, where there are two rights or powers existing in the same person. We might refer the execution of a deed to the existence of any power, though not named or referred to, in order to sustain a fair, *bona fide* transaction for a valuable consideration. But in the absence of all evidence on the face of the writing, and two rights appearing, one of the party's own, and one in a representative character, we should presume it to be in the party's own right. So we interpreted the deed of Paine and wife, in the case of *Davenport* v. *Young et al.*, 16 Ill. R. who filled the office of administrator, at the same time.

Again it is claimed that the failure to apply the purchase money was a breach of trust, and thereupon, the credit due on the mortgage debt became forfeited, and the debt became presently due, with a right of foreclosure. The only consequence that could follow such a breach of trust, would be to hold the lands in the hands of the purchaser, chargeable with the trust, and vendor and vendee with the purchase money to the use of the mortgagee. I am unable to perceive how it could possibly affect the equity of redemption or the liability of the mortgagor.

Again it is as equally untenable a position, that a conveyance of the fee by the mortgagor, is a forfeiture of his equity of redemption or credit under the mortgage. The lands would surely pass encumbered with the mortgage and mortgage debt, by such a conveyance, which could only assure the equity of redemption, even with full covenants, whatever it might purport to convey.

The mortgage and mortgage debt, therefore, remained the

same as before the conveyance, and the doctrine of forfeitures has no application to such a case.

Under this view of the case, the mortgage debt was clearly not due when this bill was filed. Had the defendant a right to the collection of rents, his remedy was at law upon his mortgage deed.

I have examined this case in every point of view presented, and am unable to discover any equity in the appellee's case, or grounds for sustaining the decree entered in his favor.

Decree reversed and bill dismissed.

*Decree reversed.*