[No. 3520.]

Coler v. Barth.

1. Notes and Mortgages.

A promissory note the payment of which is secured by mortgage or deed of trust is, as a general rule, the principal thing and the security but an incident.

2. Same—Release—Sale.

When a note secured by mortgage or deed of trust has been paid, or the indebtedness thus represented released, no valid sale can be had under the powers granted in the mortgage or trust deed.

3. Same—Redemption.

A sale under an ordinary deed of trust generally cuts off the truster's right to redeem, but when a creditor having two deeds of trust of different priorities upon the same property for different debts, enforces the junior lien and bids in the property at the sale, and then enforces the superior, he opens the right of redemption from the first sale.

4. Trustee's Sales.

When the power of sale in a trust deed provides that the sale shall be for cash, the trustee is not bound to accept the highest bid, unless it be for cash and *bona fide*. If through mistake, he strike off the property to the wrong person or to one not in a position to comply with his bid, he may, in the exercise of a wise discretion, when substantial justice can be done and the rights of interested parties be protected, select the proper bidder to whom the sale should be made and the deed be given.

5. Same—Application of Purchase Money.

The fact that a trustee has not properly applied the proceeds of a sale is not a ground for canceling his deed or for setting aside the sale, as against a *bona fide* purchaser, especially where the deed of trust absolved the purchaser from the responsibility of seeing to the application of the purchase money.

*Appeal from the District Court of Las Animas County.*

THIS is an action by William Barth to set aside a trustee's sale to W. N. Coler, Jr., made by Walter O'Malley, as trustee, and to cancel the trustee's deed, upon the grounds that the deed was fraudulently procured and executed, that there was no authority for the sale, and that the conveyance was not made to the highest bidder. The following are the material facts :

Dr. Thomas F. Martin was the owner of certain lands in Huerfano county, Colorado, upon a portion of which were a body of water called Lake Miriam and a reservoir used in connection therewith. He borrowed of R. H. Hutton $5,000 on February 26, 1886, and, to secure its payment, executed a trust deed on the premises. On April 28, 1887, he borrowed an additional $10,000 of Hutton, and, as security therefor, executed a second deed of trust on the same land, subject to the first incumbrance.

From the recitals in some of the deeds in evidence it appears that Dr. Martin secured from the town of Walsenburg a franchise for a system of water works, which franchise, together with a perpetual water right to take sufficient water from Lake Miriam and said reservoir to supply the town of Walsenburg therewith for fire, domestic and irrigation purposes, Martin, on July 16, 1888, conveyed to a corporation known as The Walsenburg Water Company. The water company executed its bonds in the sum of $30,000, which were bought by W. N. Coler, Jr., and, to secure their payment, on the first day of September, 1888, executed to the Central Trust Company of New York a trust deed upon the same property that it obtained from Martin.

Thereafter, on May 27, 1890, a third deed of trust upon all of the lands embraced in the first and second deeds of trust above mentioned (as well as upon lands not therein described) was made by Martin to secure the payment of two of his notes theretofore given to Hutton, part of which seems, as nearly as we are able to ascertain, to be the same indebtedness already secured by the prior liens.

On February 9, 1891, a fourth trust deed, also covering

this, and other property, was made by Martin to secure his notes to Barth, aggregating $20,000. Thereafter Barth bought all of the Hutton notes above mentioned. After he became their owner, he caused the second trust deed of date April 28, 1887, and the third trust deed of May 27, 1890, to be foreclosed because of a failure of the maker to pay the indebtedness secured thereby, and the property was bid in by Barth himself, and the amounts of the respective bids were credited upon the appropriate notes.

After these two junior incumbrances were foreclosed, a sale of the lands under the first trust deed of date February 26, 1886, for failure by Martin to pay the notes secured thereby, was, by Walter O'Malley, sheriff of Huerfano county, as successor in trust (Wills, the trustee, having resigned), advertised to take place at Walsenburg on April 11, 1892. There is no direct evidence that Barth, the owner of the note, caused the advertisement to be made, but the facts and circumstances disclosed in the record leave no doubt that it was at his request that the successor in trust advertised the property. In attendance at the sale were Dr. Martin, representing his own interest and also acting for W. N. Coler, who was the beneficiary under the deed of trust to the Central Trust Company; Mr. Steele, who was authorized to bid for Coler; Mr. Heisler, the attorney for Barth; and Mr. Quillian, who bid for John R. Hanna, who really was the *alter ego* of Barth in this transaction.

The property was first offered for sale in parcels, and in the bidding Quillian, acting for Hanna, participated, and when it was ascertained that the aggregate of the bids received was only $5,835 (less than the amount due on the note) the trustee then offered the property for sale *en masse*. The bidding then proceeded, the parties mentioned in turn participating, and when the bids amounted to over $7,000, being considerably more than the amount due upon the note and all the expenses of the sale, Heisler, who theretofore took no part in the sale, but was only a short distance away, appeared upon the scene in his capacity of Barth's represen-

tative, and the evidence tends to show that he first requested of the trustee to postpone the sale, as negotiations for a settlement were then in progress between Mr. Barth and the holders of the bonds secured by a trust deed upon the water right. Martin, as the maker of the various outstanding notes, and claiming an interest in the property, raised an objection, and the trustee refused to postpone the sale.

Thereupon Heisler produced the note which was secured by the trust deed under which the sale was advertised, marked paid and canceled, and asked the trustee to stop the sale and to execute a release of the deed of trust. To this, also, Martin protested upon the ground that the bids then in were in excess of the amount due upon the note, and that his rights as a remote owner of the equity of redemption, and as the debtor whose property was being sold, and as the maker of these notes, must be observed by the trustee, and that it was the duty of the latter to proceed with the sale and get therefrom as large an amount as possible.

After taking advice, the trustee announced that he would go on with the sale, to which Heisler, for Barth, publicly protested for the reasons already stated. Bids were made by Quillian, still representing Hanna, by Heisler, for Barth, and by Steele, for Coler, until Steele finally bid the sum of $15,300. Quillian then bid $15,500. Heisler then raised the bid one dollar, and Quillian bid $15,502, and the property was struck off to him.

It is in evidence, though contradicted, that before the sale opened, as well as at its close, the trustee publicly announced that the sale must be for cash only. The sale closed about noon, and it was suggested by some one present that after the midday meal the parties should assemble and the transaction be closed by the execution of the trustee's deed, upon the payment of the money. Some time in the afternoon O'Malley approached Quillian and Heisler, or at least they met, and after much discussion between them, unnecessary here to state, both Quillian and Heisler declared that no valid sale had been made, and that it was the duty of the

trustee to refuse to execute a trust deed to any one; but, if he otherwise concluded, then either Heisler or Quillian (both really representing the same party, who was Barth) should receive it.

O'Malley then offered to execute a deed upon Quillian's bid in the name of whatever party Quillian should designate, and to receive as part payment of the purchase price the $5,000 note on which the sale was based, and the balance in cash. Quillian and Heisler refused to comply with this condition, but offered to turn in, as cash, the balance due upon the $10,000 note, and to credit the balance of the purchase money upon the notes of Dr. Martin which were secured by the junior trust deeds, and then owned by Barth. The trustee refused to receive these notes as cash, but executed to Coler a trustee's deed upon his bid of $15,300, and received the full amount in cash. He then tendered to Heisler, for Barth, the full amount due on the first note and the expenses of the sale, which tender was refused, and paid the balance to Dr. Martin, as the maker of the original trust deed, as that instrument in terms provided, and deposited in the local bank in Walsenburg, in his name, as trustee, the amount due on the first note of $5,000, which Heisler had refused to accept.

It appears that O'Malley, as trustee, executed three trustee's deeds to Coler, the second in date of priority, as claimed by Coler and O'Malley, to correct errors in the first, and the last to correct omissions and mistakes in the other two. Such other facts as are material are stated in the opinion.

The trial court made two specific findings of facts in accordance with the plaintiff's contention, viz., *first*, that Barth, the owner of the note that was the foundation for the sale, tendered the same to the trustee during the progress thereof, marked paid and canceled, forbade further proceedings, and demanded from the trustee a release deed of the deed of trust; *second*, that the sale of said property was not made to the highest bidder, nor was it struck off to Coler, or any one for him. Upon these facts the court found, as matter of law,

that the sale was not legally conducted, and that the property was not sold to Coler, and thereupon rendered a decree canceling and vacating the three trustee's deeds to him. To reverse this decree the defendants below have appealed to this court.

Mr. JOHN H. KNAEBEL, for appellant.

Messrs. C. E. & F. HERRINGTON and Mr. C. J. HUGHES, Jr., for appellee.

MR. JUSTICE CAMPBELL delivered the opinion of the court.

This controversy is best presented by a consideration of the three propositions relied upon by the plaintiff in the trial court. They are as follows: *first*, there was collusion between the grantee Coler, through his agents, and the trustee, to get title to the property in fraud of the plaintiff's equities; *second*, after there was tendered to the trustee, as paid and canceled, the note that was secured by the trust deed which was being foreclosed, all subsequent proceedings were absolutely void, and the conveyance by the trustee nugatory; *third*, the property was not conveyed to the highest and best bidder.

It is to be regretted that the testimony of Barth and O'Malley was not received, for thereby much of the uncertainty concerning the purpose and origin of this sale would be removed, and many other questions of fact, now obscure, would probably be made plain. Why Barth first foreclosed and sold the property under his second and third trust deeds, instead of proceeding under the first one, or what advantage he supposed he was getting by such an election, we do not know. Neither are we advised (except by inference or conjecture, as to which different conclusions might be drawn) what was his motive in foreclosing under the first deed of trust after acquiring, as he claimed, the title, or, at least, Martin's equity of redemption at the sale under his two

junior liens. He neglects to inform us, and while his purpose may have been honorable, it might, also, have been unworthy, when we consider the conflicting claims of the interested parties.

That this somewhat complicated controversy may be the better elucidated, it is well briefly to recall the situation of the parties, and the relative priority of their respective liens, up to the time the sale began. The first and second trust deeds covered the same property. They secured notes of the face value respectively of $5,000 and $10,000, which were owned by Barth. The amount realized at the sale under the second trust deed, the proceeds from a prior sale of personal collateral, and other payments on the principal, left due on the $10,000 note on the day of the sale in question near $4,500. Upon the $5,000 note there was at that time due not far from $5,700, making a total indebtedness at that date upon the first two notes of about $10,200.

Prior to all incumbrances securing the other notes owned by Barth, was the lien upon the water right that secured Coler's bonds. It is true that the trust deed to the Central Trust Company did not include all the lands embraced within the first and second trust deeds securing Barth's indebtedness; but as to a part thereof (viz., a perpetual water right of the specified capacity, from Lake Miriam which was situate on one of these tracts of land), it constituted a lien third in order of priority, and superior, as to said water right, to all liens of a subsequent date.

Such being the situation, the thought naturally suggests itself that it was to the interest of Barth to buy in this property at the lowest possible price, while it was for the interest of Dr. Martin that the trustee should realize from the sale the highest obtainable sum.

1. As to the first contention of the plaintiff (appellee here), no finding was made by the court below. After a consideration of the voluminous record before us, we are of opinion that it is not sustained by the evidence.

2. With respect to the two findings of fact made by the

trial court, there was not below, nor is there here, so much controversy between the parties as to their correctness, under the evidence, as there is concerning their legal effect. Indeed, we may say that the evidence clearly upholds these findings; and we therefore proceed to an ascertainment of what decree should be predicated upon them.

It is stated as a general rule, and it is unquestionably correct, that the note secured by a mortgage, or a deed of trust in the nature of a mortgage, is the principal thing, and the security but an incident; and, as a corollary, when the note is paid, or the indebtedness thus represented released, there can be no valid sale under the mortgage. This consequence, in the absence of a controlling equity calling for some qualification, is as true as the main proposition itself. *Barth v. Deuel,* 11 Colo. 494, 503; *Mutual Mill Ins. Co. v. Gordon,* 20 Ill. App. (Bradwell) 559, 566; *Coffing v. Taylor,* 16 Ill. 457; *Pearce v. Bryant Coal Co.,* 25 Ill. App. (E. B. Smith) 51; *Redmond et al. v. Packenham et al.,* 66 Ill. 434, 437.

Let us see whether there is present in this case some feature that demands a relaxation of the rule, or a yielding by it to some stronger equity. Strict foreclosure, where the mortgagee takes the property in full satisfaction of the mortgage debt, is in some respects analogous to foreclosure and sale under a deed of trust, as framed in this state, and as our law was when the sale in question occurred. In both cases the mortgagor's equity of redemption is gone. 1 Jones on Mortgages, sec. 950; 2 Jones on Mortgages, sec. 1569, and cases cited.

In the former case, any subsequent conduct of the mortgagee recognizing the continued existence of the mortgage, or evidencing an intention not to hold the property as a full satisfaction of the debt—as, for example, proceeding to sue on the debt for an alleged balance—opens the door to the mortgagor to redeem.

When in the case at bar Barth, not content with the title he got at the first sale under the junior lien, elected to foreclose the first deed of trust, this was not a proceeding to

recover an alleged balance upon the second note, and hence the same principle just mentioned is not strictly applicable. But when a creditor having two deeds of trust of different priorities upon the same property for different debts, enforces first the junior and then the superior lien, he should be held in making the sale under the first deed of trust—in accordance with an analogous principle—to open up the mortgagor's redemption, at least to the extent of giving to him a right to participate in the sale, and to a voice in its conduct.

This act of Barth in the subsequent enforcement of the senior lien was a recognition by him of the existence of the $5,000 note, and a distinct acknowledgment that Martin still had some title or interest in the property of value which it was desirable for him (Barth) to obtain. He held out to the public that a sale of the property was to be had, caused notice thereof to be advertised, and the trustee in opening the sale and in the reading of the advertisement publicly announced that the proceeding was for the purpose of selling Martin's interest in the property in order to pay his note. Barth led bidders to believe that a *bona fide* sale was to be had, and Martin and Coler, acting upon the good faith of the announcement, were, among others, on hand to protect their interests.

There is no pretense that the note was, in fact, paid by Martin, or by any one for him. The fact is that Barth chose to cancel it for reasons satisfactory to himself, which are apparent when we come to consider the situation. This choice was first made known after the bids amounted to more than the sum due upon it. But to stop the sale at this stage would have been highly inequitable both to Martin, who, as the maker of these various instruments and as the owner of a possible remote equity of redemption, had the right to insist upon the sale going on, and also to Coler, whose bonds came in ahead of all Barth's claims, except to the amount of about $10,200, after the bids passed beyond that sum.

It was then apparent that something more was to be real-

ized from the sale than the amount of Barth's first note, and then it would have been unjust to Martin to be deprived of this excess.

We conclude that, under the facts of this case, the trustee, representing not merely the creditor Barth but also Dr. Martin, might properly and legally go on with the sale, and get out of it, not only the amount due on the first note, but as much more as he could to apply on Martin's other indebtedness.

3. The trust deed provided that the sale should be made to the highest and best bidder for cash.  This fact was announced by the trustee, both at the beginning and close of the bidding, according to the testimony of the witnesses for the defendant, which is denied by some of the witnesses for the plaintiff.  If, however, there was no such announcement, still it was the rule by which the authority of the trustee was measured, and under which the sale must be made and the deed of conveyance executed.  Quillian, for Hanna, and Heisler, for Barth, nominally bid $200 more than Coler to whom the trustee made the deed.  Literally, and in one sense, Coler was not the highest bidder; but it does not follow that he was not *the highest and best bidder for cash*.  Where the power of sale provides that it be for cash, the trustee is not bound to bid off, or sell, to the one who makes the highest bid, unless it is for cash, and *bona fide*. He must exercise his sound judgment in determining who is the proper party entitled to the deed, and he may take time for that purpose.  If, through mistake, he strikes off the property to the wrong person, or to one not in a position to comply, or by subsequent investigation learns that the proper bid was not selected at the sale, he may, nevertheless in the exercise of a wise discretion, and if it appears that substantial justice has been done, and the rights of interested parties protected, select the proper person to whom, under the power by which he is acting, the sale should be made, and the deed given.  1 Devlin on Deeds, sec. 442; *Gray v. Veirs*, 33 Md. 18.

Here Quillian, whose bid was the highest, refused to carry out his contract, while Coler stood ready to pay the full purchase price in cash. Quillian offered to turn in, as cash, some of these various subsequent notes of Martin, held by Barth; but under the peculiar circumstances of this case, we consider that the trustee was not obliged to determine for himself and at his peril the validity and genuineness of these various notes, on some of which payments were indorsed. His experience already with the $5,000 note upon which he was conducting the sale, and which he supposed was unpaid, and which Barth must have represented to him as unpaid in order to get the trustee to act, but which Barth's agent tendered to him as paid during the progress of the sale, naturally would awaken his suspicion that these other notes tendered by Barth might not be altogether unquestioned. .

We must not be understood as holding that a second mortgagee to protect himself may not, in payment of his bid made at a foreclosure and sale under a first mortgage, if such bid exceeds the prior debt, turn in as cash the valid indebtedness or notes of the mortgagor, after paying cash to the amount of the senior debt. That sort of a case is not before us. If we recognize the rule that the debtor's valid notes are the equivalent of cash, and may be so used by such a bidder, still Barth's agents did not observe it. The first note and the balance of $4,500 due on the second note may have been so applied under this rule. These two equalled $10,200, leaving a difference between them and the amount of the purchase price, of $5,100. This was the only indebtedness of Barth's that was senior to that evidenced by the bonds. The subsequent notes of Barth which were tendered as part of the purchase price were secured by an instrument subsequent in date to that of the trust deed to the Central Trust Company securing Coler's bonds. Barth's subsequent notes, therefore, were not, in this transaction, the equivalent of cash. This is manifest, for, if it was the duty of the trustee out of the purchase money to pay the secured obligations of Martin in the order of their priority, then, certainly, Coler's

bonds, at least to the extent of the value of the property included in the Central Trust Company's deeds, were ahead of Barth's notes; and had the trustee received as cash these subsequent notes of Barth, he would have violated this order of priority. Hence, even under the rule invoked by appellee, he failed to tender the entire purchase price in cash, or its equivalent.

Upon these facts we are satisfied that Coler, and not Barth, was the highest and best bidder for cash. For this reason the contention of the appellee that it was the trustee's duty, after Quillian refused to protect his bid, to readvertise the property, is not tenable. As we have said, while nominally the highest bidder was Quillian, as a matter of fact, he was not the highest and best bidder for cash, but Coler was. After the trustee refused to stop the sale at Heisler's request, neither the latter nor Quillian considered the subsequent proceedings valid. Their bids were not *bona fide* and were not intended as such, and plaintiff's own evidence is conclusive upon the point that neither believed a deed thus made conferred any title. No one present at this sale who desired, or was prepared, to make a genuine bid, was prevented from doing so, unless it was by the conduct of Barth's agent; and we see no reason for setting aside, at his instance, this sale upon the ground that it was not made to the highest bidder.

4. The fact that the trustee did not, as appellee contends, make a proper application of the purchase money in excess of the amount due on Barth's first note, but, instead of delivering it to Martin, should have paid it to Barth,—is no ground for canceling these deeds or setting aside the sale. If the trustee was guilty of bad faith, or made a mistake, in not giving the surplus to Barth, if he was entitled to it, it was his act after the sale was over, and after Coler's rights were fixed. The court did not find, nor is the evidence sufficient to establish, that this act of the trustee was the result of any fraud or conspiracy in which Coler participated, and as the express provisions of the trust deed absolve the pur

chaser from any responsibility for a wrong application of the purchase money Barth must look to the trustee, or to Martin, who is not a party to this action, and not to Coler, for any alleged diversion of that fund from its proper channel.

Many other questions have been discussed by counsel—some of them interesting, but, in our view of the case, not important or controlling—and for these reasons we have not discussed them, though we have examined into every phase of the case as presented by counsel. Upon the whole case we are satisfied that substantial justice requires that this case be reversed. The trial court did not err so much in its findings of facts as in the application of the law to those facts. The facts as found do not support the judgment rendered by the lower court. For these reasons the decree is reversed, with instructions to the lower court to dismiss the plaintiff's complaint, without prejudice to the right of the plaintiff hereafter to proceed against defendant O'Malley for the alleged misapplication of the purchase money.

*Reversed.*