## W. W. BERRY *v.* PLANTERS' BANK and others.

### October Term, 1875.

SUNDAY — COMMON AVOCATION — EXECUTED CONTRACT. — Where a contract on Sunday is executed, each party is *in pari delicto*, and no relief can be granted because it was made by one of them in the exercise of his common avocation.

CONTRACT — RECEIPT OF MONEY UNDER PROTEST. — A protest against the character of money received, where the contract is voluntarily made, amounts to nothing.

CONTRACT — EXECUTED WITHOUT BEING READ. — The mere fact that a party did not read the contract signed by him is not a sufficient ground for coming into equity to be relieved from its obligations.

*A. L. Demoss*, for petitioner.
*T. H. Malone*, for trustees.

THE CHANCELLOR : — On demurrer to the petition of Henry W. Compton.    The bill is filed for the purpose of executing a trust conveyance of its assets made by the Planters' Bank of Tennessee, in trust for the note-holders and creditors, and to wind up the bank as an insolvent corporation.    The petitioner, Compton, seeks to set up a claim against the bank.    His petition was filed in the year 1869,

and is demurred to.   The facts as disclosed by the petition are these:

On or about February 13, 1862, the petitioner deposited in the Bank of Tennessee, at Nashville, $10,833, "all of which were the issues of the Planters' Bank, Union Bank, or Bank of Tennessee," except $175 Confederate treasury-notes.  "Said issues of the Planters', Union, or Bank of Tennessee were good, and passed currently at par."   When he made the deposit, it was agreed between him and the president of the bank that it should be repaid him in the same kind of funds deposited, and the teller put upon his pass-book the amount of the deposit, and that $175 thereof consisted of Confederate treasury-notes.   This pass-book has been left with the bank, and the officers say that it cannot be found.   The bank has, however, a book which contains an instrument in the handwriting of the president of the bank, dated February 13, 1862, which provides that the depositors of the bank should receive for their deposits the issues of the Planters' or Union Banks, of the Bank of Tennessee, or of Southern banks, or Confederate treasury-notes, at the option of the bank; and under this instrument are a number of names, and among these names the petitioner finds his own signature.   The petitioner says " he never read this paper, nor had it read to him, or knew its contents when his signature was made ; in fact, he had forgotten having made his signature thereto."   " *He supposes* " the reason why he made his said signature was that, as it had been the custom of the bank to keep a book of signatures of their depositors, to detect forged checks, " he thought he was merely giving his signature for this purpose," and not for the purpose of putting himself under the control of the bank in reference to his deposit, which, he avers, he would never have done.

On February 16, 1862, the news of the fall of Fort Donelson reached him, and he was informed that he had better remove his deposits from the bank.   He went to the bank

to make inquiry about his deposit, and arrived there in the afternoon, and found — Sunday as it was — all the bank officers at their post, attending to their usual avocations, with the bank doors open, and paying off the depositors in Confederate treasury-notes. They paid out nothing else that day, and must have paid out as much as $100,000. "That when he asked for his deposit, the teller of the bank replied to his demand that the bank would pay him in Confederate treasury-notes,— that they were paying that sort of money only. He refused to take it, and, after some debate about it between him and the teller, the latter threw out the amount of his deposit in Confederate treasury-notes on the counter, and said to him that unless he would receive them he would get nothing. He had been well acquainted with the teller for many years, and on good terms with him, and believing that the bank had nothing on hand except Confederate money, and would turn out to be pecuniarily worthless, he received the bundle of Confederate notes, under protest."

"Believing," he adds, "that the bank was in a ruined condition," and in order to make the best of a hard case, he invested the money thus received, with some other money obtained from his brother, on February 28, 1862, in a draft of the Union Bank of Nashville on the Union Bank of Louisiana, payable to himself at sight, in Confederate treasury-notes, and, on May 4, 1862, let a third person named have it, to be accounted for in currency. That this draft was presented to the drawee in April, 1863, and again in February, 1864, and protested for non-payment. "It is proper to add," says the petition, "that the Federal commander, General Banks, by his order No. 202, caused the funds of the bank to be turned over to the United States authorities, some time after the capture of New Orleans by the United States forces, and may have put it out of the power of the bank to control its funds." A suit was afterwards brought in petitioner's name, for the use of his as-

signee, on said draft, against the Union Bank of Tennessee, which resulted in favor of the bank.

The petitioner avers that at the time he received his deposit in Confederate notes the bank had in its vaults gold, and other good assets, and has since redeemed its issues, paid its debts, and made a dividend among its stockholders; that the condition of the bank was known to its officers, and a material fact misrepresented to him. He asks that he be paid the amount of his deposit out of the assets of the bank.

The demurrer is to the whole petition, assigning various causes addressed to the different grounds of relief apparently relied on in the petition.

One of these grounds is that the payment to the petitioner of his deposit was made to him on Sunday, in the exercise, by the bank, of its "common avocation," and therefore void. Code, sec. 1723. The statute excepts "acts of real necessity," and the facts disclosed by the bill go far to bring the transaction within the excepted class. But the contract was clearly executed, and each party *in pari delicto*, and no relief can, on this ground, be granted to either. 1 Story's Eq. Jur., secs. 298, 299; Story on Con., sec. 616, and cases cited.

Stress seems to be laid, in the petition, on the fact that the deposit was received "under protest." But a protest amounts to nothing if the contract was voluntarily made, not under duress (*Wabaunsee County* v. *Walker*, 8 Kan. 436); for, to borrow the substance of Lord Nottingham's remark in *Webb* v. *Webb*, 3 Swanst. 658, touching a decree by consent, there can be no wrong or injustice in an act done by consent, — *consensus tollit errorem*, and *volunti non fit injuria*. And so our Supreme Court held upon a similar case, at the December term, 1874, in *Fogg* v. *Union Bank*, where a deposit of $31,656.34 was paid, and received under protest, under like circumstances, $28,000 of the payment being in Confederate notes. In that case the ground of

duress was relied on to avoid the payment. In this case no such defence is set up. See also *Savage* v. *United States*, 92 U. S. 382.

The main ground made in the petition, and the only one insisted upon in argument by the petitioner's counsel, is that, when the deposit was made, it was agreed between the petitioner and the president of the bank that the deposit should be repaid " in the same kind of funds deposited," and he was induced to take Confederate notes by the representation of the teller of the bank, " that unless he would take them he would get nothing." The idea intended to be conveyed by these positions is that there was a positive agreement that the deposit should be paid back in precisely the same character of bills deposited, and in the same amounts of each kind, and that the teller assured him that unless he took the notes then offered he never would get any thing, — meaning to be understood that the bank was otherwise hopelessly insolvent, when he, the teller, knew that the bank did have other funds, and was solvent. Even upon these suppositions, the acceptance of the payment was a voluntary act, and the averments do not make out a sufficient case to avoid it. There is no charge that the teller falsely made the statement he did, with a view to mislead him. Under the circumstances, with a hostile army on the eve of entering the city, the teller might well say, in friendship, " If you miss the opportunity you may probably never get any thing." The petition shows that the petitioner came to the same conclusion. If they were both mistaken in the result, it was an innocent mistake, into which any one might have fallen.

But a careful reading of the petition shows that the meaning sought, by the argument, to be put upon the original agreement of deposit, and upon the language of the teller, is unwarranted. The petition states that the deposit of $10,833 was made in the notes of three banks — the Planters' Bank, the Union Bank, and the Bank of Ten-

nessee — and in Confederate money, and that the agreement was that the deposit should be paid "in the same kind of funds deposited," and the teller put upon the pass-book the amount of the deposit, and that $175 thereof were Confederate treasury-notes. The agreement was not that as much Planters' Bank money as was deposited should be paid back in Planters' Bank notes, for, in that view, it would have been necessary to note the exact amount of such deposit; so of Union Bank notes; so of Bank of Tennessee notes. Nor was the agreement, as disclosed by the petition, that the depositor should elect in the notes of which of these banks he would receive his deposit, except the Confederate money. Nor, on the other hand, does the petition show that the bank might elect to pay the notes of one bank, thus deposited, in the notes of another bank. The agreement, as charged, is that the deposit was to be repaid — that is, the entire deposit — "in the same kind of funds deposited." In the absence of any thing else, the plain meaning, upon the facts averred, is that the bank may pay back the deposit — the whole deposit, including the Confederate money — in any kind of the funds deposited. It might elect to pay the whole in Planters' Bank notes, or in Union Bank notes, or in Bank of Tennessee notes, or in Confederate treasury-notes. It must have been so intended; for, otherwise, the agreement was void for uncertainty. The fact that only the amount of the Confederate notes was designated is in accordance with this view. If the intention had been to give to the depositor the right to demand any other kind of funds, it would either have been so stipulated, or the respective amounts of each kind of money would have been noted. In this view, too, the signature of the petitioner to the instrument under date of February 13, 1862, is intelligible, and in strict accord with the agreement. That instrument provided, it will be recollected, that the undersigned depositors should receive for their deposits the issues of the Planters' Bank, or of the Union Bank, or of

the Bank of Tennessee, or of Southern banks, or Confederate treasury-notes, *at the option of the bank.* That the petitioner did not read this instrument was his own fault. A person must stand by the words of his contract, and if he will not read what he signs, he alone is responsible. "It will not do," says Mr. Justice Hunt, in a recent case decided by the Supreme Court of the United States, "for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law." *Upton* v. *Tribilcock,* 91 U. S. 50, citing *Jackson* v. *Croy,* 12 J. 427; *Lies* v. *Stubb,* 6 Watts, 48; *Farley* v. *Bryant,* 32 Me. 474; *Coffing* v. *Taylor,* 16 Ill. 457; *Stapylton* v. *Scott,* 13 Ves. 427; *Alvaneley* v. *Kinnaird,* 2 Mac. & G. 7; 29 Beav. 490. And see *Hunter* v. *Walters,* L. R. 7 Ch. App. 82.

It is very true, if petitioner's signature had been obtained by fraud, or fraudulent representations as to the character of the instrument he was signing, it would not be binding. *Whitney* v. *Snyder,* 2 Lans. 477. There is no such averment in the petition. He has forgotten having made his signature, and "supposes" he put it there merely to give the bank his signature to enable it to detect forged checks in his name. Of course the validity of a signed contract cannot be impugned by such allegations. And, outside of this written contract, the verbal agreement set out in the petition is legally to the same effect. The bank had the option under it of repaying the deposit in any of the same kind of funds deposited.

The language of the teller to the petitioner, when he called for his deposit, simply is, according to the petition, "that the bank would pay him in Confederate treasury-notes; that they were paying that sort of money only;" * * * "that unless he would receive them he would get

nothing." The meaning is, "We are only paying out this kind of money, and you will get nothing else." It is a forced and wholly unwarranted inference that he asserted the bank had nothing else, or that the petitioner would never at any future time get any thing else.

The demurrer must be sustained, and the petition dismissed with costs.