Davis, J.
The declarations of the grantor, made in the absence of the grantee, were not competent evidence to prove the alleged fraud. Gay v. Gay, 26 Ohio St., 402. Not so however the statements of the grantor, whether made before or after the signing of the deed, which tend to rebut the claim of fraud, such statements being admissions or declarations against interest.
It appears that the grantee in this case is a son of the grantor, that he is an attorney at law, that in some instances he had acted as his father’s attorney and adviser, and that in the matter of drafting this deed he was entrusted with that duty by his father and upon his own suggestion. These facts raise a presumption that relations of trust and confidence existed between these parties. But we think that there appears in the record convincing proof of certain facts and circumstances which show that, when he executed this deed the grantor did not rely upon, nor was misled by, any confidential relations; and which rebut the presumption of undue advantage by the grantee and leave upon the plaintiffs the burden of showing by clear and convincing evidence that, by reason of fraud by the grantee, the deed does *237 not express the grantor’s intention at the time he executed and delivered it.
The grantor’s only claim of fraud is, that he instructed the grantee to reserve to him a life estate in the real estate conveyed and also to reserve “to him and his heirs forever” the right to enter upon the real estate to remove clay and marl, to sell and manufacture the same, and that the grantee deceived him by reading the deed as if this reservation were in it. All this the grantee specifically denies and the proof of it rests entirely on the grantor’s deposition, taken five years after the signing of the deed, when the grantor was eighty-nine years of age. He says that the only time the grantee read to him the reservations in the deed was in the grantee’s office on the day the deed was acknowledged. He also says: “He had the deed. I never had the deed that I recollect. I trusted him to make the deed that I wanted him to have; and I acknowledged it and at the time he read it to me. I didn’t read it at all.” He does not claim that he could not read. The defendant’s statement is that the deed was written out, except the date of signing and date of acknowledgment, and left with the grantor about six weeks before the signing and acknowledgment; that he read- the deed to his father exactly as it now appears, put it in a “jacket” or envelope such as are used in the court files and gave it to his father who put it in the inside pocket of his vest; that he did not see the deed again until the day it was acknowledged, but saw the envelope in his father’s pocket at times when he would be around the farm; that on the day when the deed was signed and acknowledged the grantor came to his office and said, “If I am ever going to sign this deed, I expect I better do it to-day” and *238 asked, “Where shall we go to get this acknowledged?”; that grantee told the grantor that he did not have to go any place, that he would hunt up somebody to take the acknowledgment, which he did do; and that he, the grantee, does not think that he read the deed to his father on the day it was acknowledged. This is an explicit and circumstantial contradiction of the grantor’s testimony; and it is strongly corroborated.
The deed is attached to the bill of exceptions and it is so soiled, stained and worn in the folds as to present ocular proof that it may have been carried in an inside pocket during the hot days of the summer. The defendant says that this was its appearance when his father brought it to the defendant’s office on the day it was signed and acknowledged. He says it was “so much so that I spoke to him about writing another deed that that was pretty well worn out” and that his father’s reply was, “That’s the way I want it; go' ahead and fix that one up; that’s all right.”
The acknowledgment was taken by the mayor of the city, who also is one of the witnesses to the execution of the deed. When he responded to the call of the defendant, he found the grantor alone in the office, lying unon a lounge and the deed lying upon the table. He got up, came forward and sat down at the table and signed the deed. The mayor asked him if he understood what he was signing. He replied in the affirmative. The deed was not read at that time. This witness also testifies that when it was signed and acknowledged the. deed was soiled and worn, and that it had the appearance of having been carried in the pocket.
The other witness did not know the grantor and did not remember what occurred or what was *239 said, except that the grantor signed the deed and he signed as a witness. The mayor also testifies that while he was signing the acknowledgment the grantor cautioned him not to tell anybody about the transaction. The defendant says that when the executed deed was delivered to him his father said to him, “You take this deed and do- what I told you to do with it;” and that in accordance therewith he did not have it recorded but left it in the custody of the People’s Bank, with Robert Lamb the president of the bank.
Some time after this, the defendant claims that for reasons not necessary to detail here, he went with his father to the bank; that he left his father there and was gone about twenty minutes and when he returned his. father and Mr. Lamb had the deed out and open; and that his father said to him, “We read the deed and Mr. Lamb will accommodate you.” This is corroborated by the testimony of a reputable attorney, who was intimate with Mr. Lamb; now deceased and who on one occasion, the precise date of which is not fixed, except that it was before May 7, 1902, went to the door of the directors’ room and saw Mr. Lamb and the grantor sitting together there with a paper like a deed open before them. He paused at the door of the room, did not go in and did not see what was on the paper. He knew that Mr. Lamb had tried to negotiate a purchase for some of these marl lands, but would not have remembered about the paper if he had not been consulted in regard to it a short time after-wards.
If there is any reliance to be placed on human testimony, the evidence to which we have adverted makes it reasonably certain that the grantor was mistaken when he testified that he had never *240 had possession of the deed, or opportunity to read it, and that he had never heard it read but once and that on the day of executing it. He does not himself claim that he even took the trouble to look at it when he indisputably had it in his power to look at it, just before and at the time of -signing. He certainly had a strong motive for proceeding carefully. He was dividing his estate of fourteen hundred acres among his children and was reserving, as he admits, a- valuable interest in this his home farm.
The law applicable to such a' condition of facts should be perfectly clear. Whatever presumption of fraud arising out of confidential relations may be raised, it necessarily is rebutted when it is shown that the instrument is in exact accord with the grantor’s declarations, made both before and after its execution; and that, the only charge of fraud being that it was misread to him, he had it in his possession a considerable time before signing and at other times had ample opportunity to ascertain the truth before the signing, on the day of- signing and delivery, and subsequently.
It is conceded on all sides that he was intending to make some sort of a reservation in the deed as to the marl, either for life or absolutely; and it would be impossible, because unnatural, to suppose that with the deed in his pocket for six weeks he would never look at it to learn whether it contained the reservation which he desired, or that, when questions as to the defendant’s title arose and he resorted to the deed when it was in custody of the bank, he did not then ascertain just what were its provisions. A person of ordinary-mind cannot be heard to say that he was misled into signing a paper which was different from *241 what he intended, when he could have known the truth by merely looking when he signed.
We quote from the language of Mr. Justice Hunt in Upton, Assignee, v. Tribilcock, 91 U. S., 45, 50: “It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If. this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission. Jackson v. Croy, 12 Johns., 427; Lies v. Stub, 6 Watts, 48; Farley v. Bryant, 32 Me., 474; Coffing v. Taylor, 16 Ill., 457; Stapylton v. Scott, 13 Ves., 427; Alvanley v. Kinnaird, 2 Mac. & G., 7; Burgess v. Richardson, 29 Beav., 490.”
Probably the most serious circumstance brought out against the defendant is the admitted fact that when the grantor repeatedly asked to see the deed the defendant put him off with showing him and reading to him an alleged copy and never did show him the deed itself; yet even this is not satisfactory evidence of consciousness of guilt accompanied • by fear of discovery, for another motive may have controlled in this case. It is fairly well established that this conveyance was to be kept secret by desire of the grantor and by agreement of the parties kept-off the public records — possibly because other members of the family might be dissatisfied— and therefore the only evidence of the defendant’s title was his possession of the deed itself. It crops out here and there that after the grantor went to live with one of his sons bickerings about *242 the deed became rife, and, as defendant testifies, the grantor said: “They keep deviling me about my property all the time and half the time I don’t know what I do want;” and therefore the grantee, when asked why he made a copy and took it to his father when he also had the deed with him, answered, “Simply because I didn’t propose to let anybody but my father see that deed or have hold of it — nobody with the exception of my father to see that deed.” He seems to have been seized with an apprehension, either well or ill founded, that the deed might be mutilated or sequestered. Hence he says when the conversation with his father was interrupted by the entrance of his brother, he put the copy in his pocket with the deed and they both “shut up like a clam.” Under all the circumstances his conduct does not seem to be very satisfactory proof of fraud.
“The rule of equity which prohibits a man, who fills a position of a fiduciary character, from taking a benefit from the person towards whom he stands in such a relation, stands upon a motive of general policy irrespective of the particular circumstances of the case. * * * The rule does not, however, go to the length of avoiding all transactions between the parties standing in a fiduciary relation, and those toward whom they stand in such relation. All that a court of equity requires is, that the confidence which has been reposed be not betrayed. A transaction between them will be supported, if it can be shown to the satisfaction of the court that the parties were, nowithstanding the relation, substantially at arm’s length and on an equal footing, and that nothing has happened which might not have happened, had no such relation existed. The burden of proof lies, in 'all cases, upon the party who fills the *243 position of active confidence, to show that the transaction has been fair. If it can be shown to the satisfaction of the court that the other party had competent and disinterested or independent advice, or that he performed the act or entered into the transaction voluntarily, deliberately and advisedly, knowing its nature and effect, and that his consent was not obtained by reason of the power of influence to which the relation gave rise, the transaction will be supported.” Kerr on Fraud, 151.
From the considerations which we have mentioned and from the further fact that the provisions of the deed tally exactly with the uncontradicted declarations of the grantor before and after its execution, for example, to Bartholomew in 1887, to Shawver in the presence of the grantee in January, 1900, and to Dunston in 1903, we are constrained to the view that the courts below applied too rigidly the rule as to confidential relations, and perhaps even allowed the presumption as to confidential relations to be not only a controlling factor, but the one decisive feature of the case.
The presumption which arises from the existence of relations of trust and confidence having been rebutted, fraud may not be presumed. It must be established by clear and convincing evidence before the instrument will be reformed on that ground.
When the specific charge of fraud or deceit by means of confidential relations has been fairly met, it should not be required to answer every possible hypothesis of guilt which could be suggested; for it must be remembered that the presumption imposes upon the grantee in such cases the difficult task of proving a negative. The relation of *244 parent and son, even if the latter should occupy the relation of attorney also, will not raise a presumption of undue influence. Crothers v. Crothers, 149 Pa. St., 201; Clark v. Clark, 174 Pa. St., 309, 337; Carney v. Carney, 196 Pa. St., 34, 39; Haynes v. Harriman, 117 Wis., 132, 139-141. It is said in Bigelow on Fraud, 368: “In the case of a gift from a child to a parent undue influence may be inferred from the relation of the parties, but never where the gift is from the parent h> the child.” The additional circumstance of the son acting as the scrivener may raise a presumption, as we have said; but good faith in this relation having been shown, the case stands as any other case between strangers.
The judgment of the circuit court is reversed and the petition of the plaintiff is dismissed.

Reversed.

Crew, C. J., Summers and Spear, JJ., concur. Price, J., did not sit in the case. Shaucic, J., concurs in the first proposition of the syllabus and. dissents from the judgment.